# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **VERNON L. CROSSNO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:11cv1392 JCH** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the application of Vernon L. Crossno for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.  Mr. Crossno has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.  The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Vernon Crossno (Plaintiff) applied for SSI on September 5, 2007, alleging he was disabled as of that date by bipolar disorder and obsessive compulsive disorder.  (R.[1] at 150-52.)  His application was denied initially and after a hearing held in February 2010 before

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Administrative Law Judge (ALJ) Michael D. Mance. (Id. at 12-65, 74-80.) The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Stephen Dolan, M.A., C.R.C.[2] a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that, at the time of the hearing, he was 42 years old. (Id. at 30.) He lives in a trailer with his disabled cousin and his cousin's five-year old son. (Id. at 30, 35.) Plaintiff gets food stamps, but not Medicaid. (Id. at 40-41.)

Plaintiff further testified that he last worked in 2005. (Id. at 30.) When asked about his income of more than $2,000 in 2007, he stated that he remembers working at a car wash. (Id. at 30-31.) He occasionally does odd jobs for family members and is paid in cash. (Id. at 46-47.)

Plaintiff explained that he is not able to work because he has a "hard time concentrating on certain things for a certain period of time." (Id. at 32.) Sometimes, he is motivated in the morning and feels like he is "on top of the world"; sometimes, he does not want to get out of bed and wants to isolate himself. (Id. at 32, 46.) This feeling of isolation happens at least once a month and, when it does, he goes off by himself for three or four days. (Id. at 32.) The more he isolates himself, the worse it gets. (Id. at 44.)

---

[2]Certified Rehabilitation Counselor.

Plaintiff is being treated by Dr. Vasireddy[3] at COMTREA.[4] (Id. at 33.) He has not done drugs for at least seven years. (Id.) Asked about a positive drug test in 2007, Plaintiff replied that he did not remember but did know that he has been clean and that he would be willing to be tested. (Id.) He drinks approximately a six-pack of beer a week, purchased with money borrowed from family members. (Id.) He smokes approximately one pack of cigarettes a day, purchased with money from his cousin. (Id. at 40.) Asked about a notation in the fall of 2009 that Plaintiff's depression was in full remission, Plaintiff explained that the medication he has been taking has helped. (Id. at 34.) He had been hospitalized in July 2008 for depression. (Id. at 36.) This was before he started taking medication, i.e., trazodone[5] for sleep and Prozac for depression. (Id.) He gets depressed when he is around his mother. (Id. at 40.) His mother has lung cancer, is lonely after his father – her husband for more than thirty-eight years – died six years ago, and is depressed. (Id. at 39-40.) Occasionally when he visits his mother he has hallucinations that his father is there. (Id. at 43.)

He and his cousin sit around, watch television, and play video games. (Id. at 35.) He does laundry, cooks, and cleans. (Id.) He does not have any problems getting along with people, but does occasionally have problems being around them when he wants to be alone. (Id. at 38.) He can concentrate for thirty minutes before changing focus. (Id.) When watching

---

[3]The name is misspelled as "Passaretti" in the transcript.

[4]COMTREA is the first syllables of the agency's legal name, Community Treatment Incorporated. See COMTREA, History, http://www.comtrea.org/history (last visited July 3, 2012).

[5]Trazodone is prescribed for the treatment of major depressive disorder. Physicians' Desk Reference, 3446 (65th ed. 2011) (PDR).

television, he is always changing channels.  (Id. at 38-39.)  He thought this was "pretty normal for people."  (Id. at 39.)

In November 2009, he was diagnosed with bipolar disorder.  (Id. at 45.)

After noting that Plaintiff had no substantial gainful activity in the past fifteen years and, therefore, no past relevant work, the ALJ asked the VE the following question.

> [A]ssume an individual of [Plaintiff's] age, same education level, no past relevant work.  This individual has no exertional limitations, but the individual is limited to performing simple tasks only.

> It requires no more than occasional contact with the public and co-workers.  Would there by any jobs in the national or regional economy that an individual with those limitations could perform?

(Id. at 47-48.)  The VE replied that there were dishwashing jobs and cleaner jobs at the medium and light levels, all of which existed in significant numbers in the local and national economies.  (Id. at 48.)  These numbers would not be adversely affected if the individual should have no more than occasional contact with co-workers and no significant contact with the public.  (Id.)

If, however, the hypothetical person had occasional unscheduled disruptions in the work day and work week, "subject to [a] potential periods of decompensation [and] the inability to concentrate on the particular job for a full eight hours a day during the work day" and (b) potentially missing work a number of times each month for doctor's appointments and other related reasons, there were no jobs he could perform.  (Id.)

The VE further stated that his testimony was consistent with the *Dictionary of Occupational Titles* (DOT).  (Id. at 49.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments by examining and non-examining consultants.

When applying for SSI, Plaintiff completed a Disability Report. (Id. at 168-77.) He listed his height as 5 feet 11 inches tall and his weight as 135 pounds. (Id. at 168.) He is limited in his ability to work by bipolar disorder and obsessive compulsive disorder. (Id. at 169.) These disorders prevent him from thinking for himself and making good decisions. (Id.) They also cause him to be depressed and to walk off jobs because he does not think he's "good enough." (Id.) The disorders first interfered with his ability to work on September 5, 2007, and caused him to be unable to work that same day. (Id.) He stopped working on August 16, 2007, when he walked off a job thinking he was not good enough. (Id.) Plaintiff graduated from high school in 1986. (Id. at 176.) He was not in special education classes. (Id.) Plaintiff reported that he has had to deal with his disabilities since he was a teenager. (Id.)

On a Function Report, Plaintiff disclosed that he lived with his mother. (Id. at 178-85.) Asked to describe what he does after he wakes up each day, Plaintiff replied that he is "stressed out most of the day." (Id. at 178.) He sleeps for approximately one-half the day and usually does not know if he is "coming or going." (Id.) Half the time, he does not feel like getting dressed. (Id. at 179.) He does not like combing his hair or shaving, and has to be reminded to brush his teeth. (Id. at 179, 180.) He was able to make good choices before his illness. (Id. at 179.) He does not cook or do any household chores. (Id. at 180.) His hobby

is watching television, which he does four hours a day. (Id. at 182.) Before his illness, he had energy; now, he is always depressed. (Id.) He stays indoors. (Id. at 183.) His impairments affect his ability to talk, remember, concentrate, understand, follow instructions, and get along with others. (Id.) He can walk no farther than one block before having to rest for five minutes. (Id.) He can pay attention for no longer than a few minutes. (Id.) He does not finish what he starts, and cannot follow written or spoken instructions. (Id.) He gets along fine with authority figures. (Id. at 184.) He does not handle stress or changes in routine well. (Id.) He does not like to go out by himself. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications. (Id. at 196-202.) He had been in the hospital the month before after becoming suicidal. (Id. at 197.) He is on additional medications and has been diagnosed with bipolar disorder. (Id.) His current medications include Depakote,[6] Prozac, and Seroquel.[7] (Id. at 199.) The Prozac causes side effects of shaking and high anxiety; the Seroquel makes him drowsy. (Id.) His disorders make him lazy and cause swings in his energy level. (Id. at 200.) He still does nothing but sit around the house. (Id.)

A report generated pursuant to Plaintiff's application listed annual earnings of $18,862.20 in 1989 increasing to $24,708.04 in 1991 and then decreasing to $20,854.28 in 1992. (Id. at 153.) The following year, he earned $6,121.51; the year after, $9,366.96. (Id.)

---

[6]Depakote is prescribed for migraine headaches. See mediLexicon, Depakote (divalproex sodium, http://www.medilexicon.com/drugs/depakote_133.php (last visited June 29, 2012).

[7]Seroquel is an antipsychotic medication prescribed for the treatment of schizophrenia, bipolar disorder, or depression associated with bipolar disorder. PDR at 735.

The next highest earnings after 1994 – his last year of substantial gainful activity – were $2,498.74. (Id.) Plaintiff earned $18.00 in 1997 and $24.00 in 1998. (Id.) He had no earnings in 1999, 2005, and 2006. (Id.) As mentioned by the ALJ, he had earnings of $2,142.13 in 2007. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in April 2003 when Plaintiff was evaluated in by Peter S. Moran, D.O., a psychiatrist at COMTREA. (Id. at 301-03.) Plaintiff reported "a long history of alcohol and cocaine abuse" and was then, at his own choosing, in a treatment center for substance abuse. (Id. at 301.) He had been admitted two months earlier to a psychiatric center for detoxification. (Id.) He reported "having considerable trouble with anxiety and depressions when he first stopped drugs," but was "quite comfortable, now." (Id.) His parents had divorced when he was 25 years old. (Id. at 302.) He had had "a good employment record until last year when substance abuse became more severe." (Id.) He had been married and divorced twice. (Id.) He described earlier suicidal ideation but no attempts. (Id.) He had no evidence of a thought disturbance and was of normal intelligence and intact insight. (Id.) He was diagnosed with a mood disorder secondary to drug abuse and a probable personality disorder. (Id. at 303.) His Global Assessment of Functioning was 55.[8] (Id.)

_____

[8]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Plaintiff's next medical record is from four years later when, in August 2007, he was admitted to the St. Joseph Health Center after going to the emergency room for depression and suicidal ideation. (Id. at 241-55.) His contact was Janice Ham, a friend. (Id. at 241.) He had not eaten for two and one-half days and could not sleep at night. (Id. at 243, 247.) He reported that he had been taking Seroquel and trazodone for depression but had quit taking both a year earlier because he felt better and had a cough. (Id. at 244, 247, 249.) A friend had recently committed suicide. (Id. at 244, 247.) He worked part-time. (Id.) His GAF on admission was 30. (Id. at 243.) His history of psychiatric problems included bipolar disorder. (Id. at 246.) He lived alone. (Id.) He denied any history or present use of drugs but tested positive for cannabis and cocaine. (Id. at 244, 255.) He was treated with Prozac and participated in daily treatment groups. (Id. at 242.) His mood improved, and, on discharge four days later, he denied any suicidal or homicidal ideations and any auditory or visual hallucinations. (Id.) He was discharged with a diagnosis of major depressive disorder, a prescription for Prozac, and an anticipatory GAF of 50.[9] (Id.)

On November 26, Plaintiff was admitted to the Hannibal Regional Hospital.[10] (Id. at 256-63.) He reported that he had quit taking his medication, Prozac and Seroquel, after his mother died three weeks earlier and he no longer wanted to live. (Id. at 256.) Also, a friend

---

[9]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

[10]The Hannibal Regional Hospital is approximately 120 miles from Plaintiff's residence. See Yahoo!maps, http://maps.yahoo.com/#q1=2328+Summit+Dr%2C+Arnold (last visited July 2, 2012) (calculating distance between hospital and Plaintiff's September 2007 residence). Plaintiff testified that he went there when he was depressed and wanted be alone. (R. at 43.)

had committed suicide. (Id.) He was an employee of Mack's Roofing but had no health insurance. (Id.) His assets included a "good work history." (Id. at 260.) He reported having had past psychiatric hospitalizations, but denied any past suicide attempts and any significant drug abuse. (Id.) He had been an average student and had never had any behavior problems. (Id.) He had had many friends when in school. (Id.) He had been married once and was now divorced. (Id.) It was noted that he had a diagnosis of bipolar disorder. (Id. at 256.) On examination, he was pleasant, cooperative, of average intellect, and had a fair memory and adequate insight and judgment. (Id. at 261.) His thoughts demonstrated logical associations; his speech was within normal limits. (Id.) His mood was depressed. (Id.) He was started on Depakote in addition to the Seroquel and Prozac. (Id. at 256.) His symptoms then "improved considerably." (Id.) At discharge on December 3, he stated that he would comply with his medication regimen. (Id.) His discharge diagnosis was Bipolar I disorder, depressed, moderate, chronic, with rapid cycling.[11] (Id. at 257, 263.) His GAF, which had been 21 on admission, was 65 at discharge.[12] (Id.)

---

[11]"For a diagnosis of Bipolar I disorder, a person must have at least one manic episode. . . . Depression is often experienced as the high quickly fades . . . ." Psychiatric Disorders: Bipolar Disorder (Manic-Depression), http://allpsych.com/disorders/mood/bipolar.html (last visited July 2, 2012). In Bipolar II disorder, the periods of high are "hypo manic" and are often followed by periods of depression. Id. The two disorders "have similar symptoms but they are not severe enough [in Bipolar II] to cause marked impairment in social or occupational functioning and typically do not require hospitalization in order to assure the safety of the person." Id.

[12]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

Plaintiff consulted Ashutosh Patel, M.D. at Jefferson County Internal Medicine in April 2008 about "high stress" for the past two months at work and his family. (Id. at 306-07.) He had difficulty falling asleep and staying asleep. (Id. at 306.) He had no interest in any activities, was depressed, was sad, and intermittently cried easily and felt overwhelmed. (Id.) His mother and father were both alive. (Id.) He drank alcohol socially once a month. (Id.) On examination, he was pleasant with normal eye contact. (Id.) Dr. Patel started Plaintiff on Prozac and Ambien[13] and advised him to seek counseling. (Id. at 307.)

Plaintiff was admitted from the emergency room to Christian Hospital Northeast/Northwest on July 4 for depression. (Id. at 321-61.) He reported that he had been off his medications for a month and was feeling suicidal. (Id. at 323, 325, 327, 343, 345, 348.) Three days a week, he drinks a twelve-pack of beer; the last time was the night before. (Id. at 327, 346.) He reported that he had never had a period of sobriety and had never been in treatment due to alcohol or drug use. (Id. at 346, 351.) He had been staying with a friend but had been asked to leave. (Id. at 327.) His family would not let him return home. (Id.) His assets included an ability to work. (Id.) He had been employed for the past three months. (Id. at 351.) At one time, he reported being at his current job for twenty years; at another time, he reported it had been for eleven years. (Id.) He had a problem at work with absenteeism and had missed three to four days since starting the job. (Id.) He did not appear to be in any acute distress, although his mood was depressed and his affect was sad. (Id. at 325, 328.) He was diagnosed with major depression, recurrent, and alcohol abuse. (Id. at 328.) His current GAF

---

[13]Ambien is prescribed for "the short term treatment of insomnia . . . ." PDR at 2924.

was 35.  (Id.) The day after admission, Plaintiff thought life was worth living, denied suicidal ideation, and had no other concerns.  (Id. at 323.)  It was noted that he had a history of alcohol and cocaine abuse.  (Id. at 325.)  Three days after admission, Plaintiff had no psychotic symptoms or suicidal or homicidal ideation.  (Id. at 323.)  He had goal-directed speech, a good mood, and a bright affect.  (Id.)  His discharge diagnosis was major depression, recurrent; alcohol abuse; and personality disorder, not otherwise specified (NOS).[14]  (Id.)  It was noted that he did not comply with treatment.  (Id.)  His GAF was 50.  (Id.)  His discharge medications included Prozac and Ambien.  (Id. at 324.)  He was encouraged to call COMTREA for further treatment.  (Id.)

Plaintiff had an initial assessment by Karen Salsman, M.S.Ed., at COMTREA on December 3.  (Id. at 318-20.)  He reported that he had a history of bipolar disorder and had run out of his medications – which were helpful – twenty days ago.  (Id. at 318.)  He did not have insurance, needed his medication, and could not afford to go to Dr. Patel.  (Id.)  His affect was labile, his mood elevated, and his judgment poor.  (Id.)  He reported that his parents had been married for 38 years until his father had died four years earlier.  (Id.)  His relations with his parents had been good.  (Id.)  He had been married twice, and was divorced twice.  (Id.)  He had had several psychiatric hospitalizations, the most recent being six months earlier for

---

[14]According to the DSM-IV-TR, each diagnostic class, e.g., personality disorder, has at least one "Not Otherwise Specified" category.  DSM-IV-TR at 4.  This category may be used in one of four situations:  (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

suicidal ideation. (Id.) He had drunk a case of beer in the last thirty days and had used marijuana and cocaine in the past five years. (Id.) He was having symptoms of forgetfulness, difficulty concentrating, irritability, anxiety, boredom, isolation, and, recently, depression. (Id. at 320.) Ms. Salsman referred Plaintiff for a psychiatric evaluation and planned to meet with him again in two weeks "to gather more information for assessment of services." (Id.)

Plaintiff saw Dr. Patel again on January 6, 2009, complaining of "high stress" at work and with his family, disturbed sleep, a depressed mood, and a feeling of being overwhelmed. (Id. at 308-09.) On examination, he was in no acute distress. (Id.) His depressive disorder had not changed. (Id.) His prescriptions for Prozac and Ambien were stopped; he was started on Xanax, prescribed for the treatment of anxiety disorders,[15] and sertraline, prescribed for the treatment of panic disorders.[16] (Id.) He was also advised to seek counseling and consult a psychiatrist. (Id.)

Explaining that he had not had any psychiatric treatment at COMTREA for ten years and that he was applying for disability, Plaintiff was seen by Gautam Rohatgi, M.D., a psychiatrist, on February 2. (Id. at 295-98.) Plaintiff further explained that he had bipolar disorder and was currently depressed. (Id. at 295.) He denied any loss of interest, "any neuro-vegetative signs and symptoms of depression." (Id.) His last major depressive episode was one week earlier and a manic episode was four days earlier. (Id.) His depressive episodes

---

[15]See Drugs.com, Xanax, http://www.drugs.com/search.php?searchterm=Xanax (last visited July 2, 2012).

[16]See mediLexicon, Zoloft (sertraline HCl), http://www.medilexicon.com/drugs/zoloft_292.php (last visited July 2, 2012).

generally lasted three to four days; his manic episodes lasted for three days.  (Id.)  For the past ten years, he had suffered from "some shaking, sweats, clammy hands," and feeling like he had a headache.  (Id.)  He did not have any obsessions, compulsions, or phobias.  (Id.)  "[H]e ha[d] been in multiple psychiatric hospitals over the past 10 to 15 years," most of which were related to substance abuse  (Id. at 295-96.)  He smoked one pack of cigarettes a day and, until twelve days ago, drank a twelve-pack of beer a night.  (Id. at 296.)  He used to smoke marijuana, but stopped three years earlier.  (Id.)  He did not mention any cocaine use.  (Id.)  He lived with his cousin, spent his days playing video games and sleeping, was single, and had been married twice.  (Id. at 297.)  On examination, he was cooperative and had good eye contact, fluent and clear speech, linear thought processes, an euthymic mood, and fair insight and judgment.  (Id.)  He had no delusions, phobias, obsessions, hallucinations, illusions, or suicidal or homicidal ideations.  (Id.)  He was alert and oriented to person, time, and place.  (Id.)  The diagnosis was mood disorder, not otherwise specified.  (Id.)  Bipolar II disorder[17] and major depressive disorder were to be ruled out.  (Id.)  His GAF was 55.[18]  (Id.)  He was to arrange substance abuse counseling and to participate in weekly supportive therapy at COMTREA, return in two weeks for psychotherapy, and obtain a primary care physician.  (Id. at 298.)  And, he was to take trazodone for insomnia and sertraline.  (Id.)

Plaintiff returned to Dr. Rohatgi in June.  (Id. at 293-94.)  He reported having a depressed mood, decreased motivation, and disturbed sleep.  (Id. at 293.)  He denied having

---

[17]See note 11, supra.

[18]See note 8, supra.

any difficulties with activities of daily living and any symptoms of psychosis or anxiety.  (Id.)
He had no current medications.  (Id.)  There were no abnormalities observed on examination,
although Plaintiff reported that he was depressed.  (Id.)  His diagnosis remained as a mood
disorder, NOS; his GAF remained at 55.  (Id.)  He was prescribed Prozac and trazodone.  (Id.
at 294.)  He was to return in one month, which he did.  (Id. at 291-92, 294.)  He denied any
depressed mood, decreased motivation, or medication side effects.  (Id. at 291.)  His disability
hearing was scheduled in two days.[19]  (Id.)  His examination was normal; his diagnosis and
GAF were unchanged.  (Id.)  His trazodone dosage was increased; his Prozac dosage was not.
(Id. at 292.)

When Plaintiff next saw Dr. Rohatgi, in August, he again reported having no symptoms
of depression, psychosis, or anxiety.  (Id. at 314-15.)  He continued to smoke, but did not drink
alcohol or use illicit drugs.  (Id. at 314.)  He had had no medication side effects.  (Id.)  He was
eating and sleeping well, but did become anxious for the past two weeks at approximately 6
o'clock in the evening.  (Id.)  There were no abnormal findings on examination.  (Id.)  His
diagnosis of major depressive disorder, recurrent, was characterized as being in full remission.
(Id.)  His GAF was again 55.  (Id.) He was continued on the Prozac and trazodone and was to
follow up in two months.  (Id. at 314-15.)  When he did, his diagnosis and medications
remained unchanged.  (Id. at 312-13.)  Again, his examination was normal.  (Id. at 312.)  He
requested a follow-up in one month.  (Id. at 313.)

---

[19]The hearing was continued when Plaintiff decided to obtain representation.

- 14 -

In November, Plaintiff saw Jhansi Vasireddy, M.D., a psychiatrist, with complaints of feeling anxious and restless. (Id. at 310-11.) His sleep and appetite were okay. (Id. at 310.) He was living with, and taking care of, his diabetic cousin. (Id.) The stress from this role makes him not want to do anything else. (Id.) He has periods when he is very happy, has a lot of energy, and needs less sleep. (Id.) These periods last for two to three days. Lately, he has been "feeling more on the 'downside.'" (Id.) He was having a hard time finding a job and had applied for disability. (Id.) On examination, his attention span and concentration were mildly impaired; his mood and affect were mildly anxious. (Id.) He was alert, oriented, cooperative, and with good eye contact, normal speech, and a goal-directed thought process. (Id.) He was diagnosed with Bipolar II disorder, depressive phase. (Id.) His GAF was 55. (Id. at 311.) Prozac was discontinued because it could cause akathisia[20]; instead, PRISTIQ was prescribed for his depression and anxiety.[21] (Id.) He was to follow up with supportive therapy and to return in one month. (Id.)

Ms. Salsman informed Plaintiff on January 5, 2010, that he could be discharged from the program at COMTREA for having missed four appointments in a row with Dr. Vasireddy. (Id. at 316.) To avoid this, he had to make an appointment within ten days. (Id.)

He did not.

Also before the ALJ were two assessments of Plaintiff's mental impairments.

---

[20]Akathisia is "[a] syndrome characterized by an inability to remain in a sitting position . . . ." Stedman's Medical Dictionary, 41 (26th ed. 1995).

[21]See PDR at 3409.

On December 20, 2007, Plaintiff underwent a psychological evaluation by Michael T. Armour, Ph.D. (<u>Id.</u> at 264-70.) When asked about behavior problems growing up, Plaintiff reported that he had started running away from home when he was fourteen and "ran away 'quite a bit.'" (<u>Id.</u> at 265.) He had had a problem with lying, but not with stealing. (<u>Id.</u>) He had had friends, but none were close. (<u>Id.</u>) He had graduated in 1986 and had not been in any special education classes. (<u>Id.</u>) He had been married twice. (<u>Id.</u>) He had not worked full-time for seven years. (<u>Id.</u>) He drank a "'very little'" and had smoked "'a little'" marijuana. (<u>Id.</u>) Plaintiff reported that he had been psychiatrically hospitalized eight or nine times. (<u>Id.</u> at 266.) One time, he had overdosed. (<u>Id.</u>) He has problems with excessive anxiety and wanting to be isolated. (<u>Id.</u>) When his mood is elated, "he has problems with excessive energy, racing thoughts, pressured speech, decreased sleep, and poor concentration." (<u>Id.</u>) He goes from task to task. (<u>Id.</u>) When his mood is depressed, he has crying spells, feels worthless, has no energy, and still feels tired after sleeping for ten to twelve hours. (<u>Id.</u>) He currently lived with his mother in her house. (<u>Id.</u>) He can cook and clean, but cannot handle money. (<u>Id.</u>) He is unable to work because he cannot handle crowds, makes bad choices, cannot concentrate, and "has racing thoughts." (<u>Id.</u>)

On examination, Plaintiff was alert and oriented to person, place, and time. (<u>Id.</u> at 267.) His speech was clear with "a mildly slowed rate, flat rhythm, and soft volume"; his responses were relevant, coherent, logical, and goal-directed. (<u>Id.</u>) He had no difficulty in either understanding or responding to questions. (<u>Id.</u>) His mood was "mildly anxious." (<u>Id.</u>) His affect was limited in range, but was appropriate "to his self-report of his mood." (<u>Id.</u>) He

denied having "first rank symptoms indicative of an ongoing psychotic thought process," e.g., thought broadcasting or thought control, and experiencing any auditory hallucinations. (<u>Id.</u>) He did report having visual hallucinations of seeing his deceased father. (<u>Id.</u>) He had difficulty falling asleep and awakening in the early morning. (<u>Id.</u>) He ate approximately once a day. (<u>Id.</u>) His problems with anxiety limited his ability to be around other people. (<u>Id.</u>) Also, he was easily distracted and had difficulty focusing. (<u>Id.</u>) He did not engage in any obsessive thinking, compulsive behaviors, or compulsive rituals. (<u>Id.</u>) He had ongoing suicidal ideation but no plans or intent. (<u>Id.</u>) His energy level was currently low and fluctuated between very low and very high. (<u>Id.</u>) His intelligence was estimated to be in the low average range, although his long-term, recent, and immediate memory were all intact. (<u>Id.</u> at 268.) He displayed adequate concentration, but complained of poor overall concentration. (<u>Id.</u>) Dr. Armour diagnosed Plaintiff with major depressive disorder, recurrent, and severe. (<u>Id.</u>) Bipolar disorder should be ruled out. (<u>Id.</u>) His current GAF was 50. (<u>Id.</u>)

Dr. Armour next addressed the affects of Plaintiff's mental impairments on his functioning. (<u>Id.</u> at 268-69.) He concluded that Plaintiff had a moderate impairment in his ability to understand instructions and, at times, in his ability to remember and apply instructions. (<u>Id.</u> at 268.) "His basic ability to understand instructions [was] intact." (<u>Id.</u>) He was likely to have problems processing and recalling information when his mood symptoms were more pronounced. (<u>Id.</u>) Based on his reports, his appearance of anxiety at the evaluation, and his medical records, Plaintiff had, at times, a significant impairment in his ability to sustain concentration and persistence. (<u>Id.</u> at 268-69.) Based on his reports and his

recent hospitalization, Plaintiff also suffered from significant impairment in his ability to interact socially and adapt to his environment. (Id. at 269.) Dr. Armour noted that Plaintiff lived with his mother and was dependent on her for financial support. (Id.)

The following month, Joan Singer, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff. (Id. at 271-73.) She concluded that in the area of understanding and memory, he was not significantly limited in two abilities and was moderately limited in one, i.e., the ability to understand and remember detailed instructions. (Id. at 271.) In the area of sustained concentration and persistence, he was not significantly limited in four of the seven abilities and was moderately limited in the remaining three: the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to work in coordination with or proximity to others without being distracted by them. (Id. at 271-72.) In the area of social interaction, he was not significantly limited in two abilities and was moderately limited in three: the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id. at 272.) And, in the area of adaptation, Plaintiff was not significantly limited in three abilities and was moderately limited in the remaining one: the ability to set realistic goals or make plans independently of others. (Id.)

Dr. Singer also completed a Psychiatric Review Technique form (PRTF). (Id. at 274-85.) She assessed Plaintiff as having an affective disorder, i.e., major depressive disorder, that

caused mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 274, 277, 282.) They caused one or two episodes of decompensation of extended duration. (Id. at 282.)

## The ALJ's Decision

The ALJ first found that Plaintiff had not engaged in substantial gainful activity since filing his SSI application on September 5, 2007. (Id. at 17.) He next found that Plaintiff had severe impairments of bipolar disorder, polysubstance abuse, and major depressive disorder. (Id. at 17.) In so finding, the ALJ noted that Plaintiff had a positive drug screen in August 2007and did not pursue care again until November 2007, at which time he was diagnosed on admission with a GAF of 21 based on his reporting of suicidal ideation and with a GAF of 65 on discharge. (Id. at 17-18.) He had also had no care between April 2008 when he saw Dr. Patel and July 2008, when he went to Christian Hospital with reports of feeling suicidal and having recently been drinking a twelve-pack of beer a day. (Id. at 19.) And, the only health care provider Plaintiff saw on a continuing basis, Dr. Rohatgi, described Plaintiff's depressive disorder as being in remission. (Id. at 20-21.) The ALJ concluded that Plaintiff's severe impairments did not meet or medically equal an impairment of listing-level severity because they did not cause at least two "marked" limitations in the three areas of functioning or one "marked" limitation and "repeated" episodes of decompensation. (Id. at 21-22.) Specifically, Plaintiff had a mild restriction in his activities of daily living; moderate difficulties in social

functioning and in concentration, persistence, or pace; and one to two episodes of decompensation, each of extended duration. (Id. at 21.)

The ALJ then assessed Plaintiff as having the residual functional capacity (RFC) to perform a full range of work at all exertional levels with nonexertional limitations of performing simple tasks only that require no more than occasional contact with the general public and co-workers. (Id. at 22.) In reaching this conclusion, the ALJ considered the credibility of Plaintiff's statements about the "intensity, persistence and limiting effects" of his symptoms. (Id.) Detracting from Plaintiff's credibility were the pattern of his inpatient psychiatric care being preceded by substance abuse or noncompliance with his treatment regimen; the "relative lack of clinically significant findings of recent examinations"; the "numerous breaks" in his pursuit of treatment, particularly during a period for which he claims disability; and his poor work history. (Id. at 23.)

Given Plaintiff's age, education, and RFC, there were jobs described by the VE that he could perform. (Id. at 24.) He was not, therefore, disabled within the meaning of the Act. (Id.)

### Additional Records Before the Appeals Council

Plaintiff's attorney submitted to the Appeals Council records of his hospitalization five months after the ALJ's adverse decision.

On September 23, 2010, driven by friends, Plaintiff went to the emergency room at St. Anthony's Medical Center with complaints of depression and suicidal ideation for the past three weeks. (Id. at 363-19.) He had tried suicide one time before. (Id. at 377.) He had been

arguing with his mother and felt like he was a burden on her. (<u>Id.</u> at 369, 401, 407.) He had

been taking Prozac, but was no longer. (<u>Id.</u> at 369.) He had been seeing Dr. Patel, but had had

no other psychiatric treatment. (<u>Id.</u>) He had not slept or eaten for two days. (<u>Id.</u> at 401, 404,

406.) On examination, he was anxious, nervous, moody, depressed, and had impaired insight

and judgment. (<u>Id.</u> at 369.) He was unemployed and disabled due to bipolar disorder. (<u>Id.</u> at

371.) He denied any tobacco, alcohol, or drug use, although his urine drug screen was positive

for marijuana and cocaine. (<u>Id.</u>) Plaintiff was dressed in green scrubs and placed in a locked

room with a camera. (<u>Id.</u> at 366.) He was then admitted with a diagnosis of major depression

versus bipolar, personality problem, and GAF of 40. (<u>Id.</u> at 369.) The following day, his

depression had dropped from a nine on a ten-point scale to a six; his anxiety had increased

from zero to five. (<u>Id.</u> at 375, 383-84.) Two hours later, his depression was three; his anxiety

was four. (<u>Id.</u> at 385-86.) Reporting that the adjustments in his medication had helped and

that he no longer had any suicidal ideation, he was ready to be discharged the next day. (<u>Id.</u>

at 386.) He was discharged on September 25. (<u>Id.</u> at 391.)

## <u>Legal Standards</u>

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable

to engage in any substantial activity by reason of any medically determinable physical or

mental impairment," which must last for a continuous period of at least twelve months or be

expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of

such severity that [the claimant] is not only unable to do his previous work, but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating

physicians and others, and an individual's own description of his limitations.'" **Id.** (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [and, 5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). Where, as here, the claimant suffers from severe mental impairments, the ALJ must consult a VE, **Brock v. Astrue**, 674 F.3d 1062, 1065 (8th Cir. 2012), and elicit testimony from that expert based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider both evidence that supports the decision and evidence that fairly detracts from

that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "'If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).  <u>See</u> <u>also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

**<u>Discussion</u>**

Plaintiff argues that the ALJ erred by (a) failing to properly analyze his mental limitations when assessing his RFC, (b) failing to properly evaluate his credibility, and (c) considering an alleged failure to consistently obtain treatment.

As noted above, when assessing a claimant's RFC, the ALJ must evaluate his credibility. <u>See</u> **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005).  Indeed, in support of his challenge to the ALJ's RFC findings, Plaintiff cites his complaints of difficulties concentrating, being motivated, being around people, having an erratic mood, and experiencing occasional unscheduled disruptions.  As set forth below, however, Plaintiff's challenge is without merit.

When evaluating Plaintiff's credibility, the ALJ noted that his hospitalizations were preceded by substance abuse or not taking prescribed medication.  The records of three

hospitalizations were before the ALJ.[22]  The first was in August 2007 and was preceded by Plaintiff not taking his medication for one year.  He was reportedly working part-time[23] and did not use drugs.  He tested positive for cocaine and marijuana.  Four months later, Plaintiff was admitted to a different hospital.  He had quit taking his medication three weeks earlier.  Again, he denied drug use.  He also reportedly had a good work history and a recently-deceased mother.  Neither was accurate.  He had been married once.  To other providers, he reported being married twice.  The third admission – to yet another hospital – was preceded by Plaintiff not having taken his medication for a month.  Although Plaintiff had applied for SSI nine months earlier, his ability to work was listed as an asset.  Although Plaintiff had been in an inpatient treatment program for substance abuse five years earlier, he reported never having been in such a program.  He also reportedly drank a twelve-pack of beer three days a week and had never had a period of sobriety.  In addition to each of these periods of hospital being preceded by Plaintiff's noncompliance with his medication regimen, they ended with Plaintiff being discharged in good condition after having to follow that regimen.  The efficacy of Plaintiff's medication regimen in controlling his mental impairments is further evidenced by Dr. Rohatgi's conclusion that Plaintiff's depression was in full remission after Plaintiff had consistently consulted him for only three months.  Indeed, Plaintiff testified that the medication helped.

---

[22]As noted by the Commissioner, the fourth hospitalization was after the ALJ entered his adverse decision.  Also, reference is made to an inpatient treatment for substance abuse in 2003; the records of that treatment were not before the ALJ.

[23]When applying for SSI, Plaintiff reported that he walked off his last job in August 2007.

A claimant's noncompliance with a treatment regimen is a valid reason for discrediting his complaints. See **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010). Moreover, "'[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)); accord **Perkins v. Astrue**, 648 F.3d 892, 901 (8th Cir. 2011).

The ALJ also cited the "relative lack of clinically significant findings of recent examinations" as detracting from Plaintiff's credibility. The absence of objective medical evidence to support a claimant's complaints is a proper consideration when assessing that claimant's credibility. **Renstrom**, 680 F.3d at 1065; **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008). On examinations, Plaintiff routinely was alert, cooperative, pleasant, oriented, with normal speech and goal-oriented thought, of average intelligence, and with intact memory. See **Halverson v. Astrue**, 600 F.3d 922, 928, 930 (8th Cir. 2010) (affirming ALJ's adverse decision rejecting claim of disabling mental impairment when claimant was consistently described in medical records as having an appropriate demeanor and appearance and as being alert and oriented with normal speech and thought process).

Citing Dr. Armour's findings, Plaintiff counters that the medical evidence supports his testimony. Those findings, however, confirm the disparity between the objective evidence and Plaintiff's complaints. For instance, Dr. Armour noted that Plaintiff *displayed* adequate concentration but *complained* of poor concentration. His examination notes consistently refer to Plaintiff reporting, describing, or denying some symptom or difficulty. For instance,

Plaintiff reported having to leave public places due to anxiety, described himself as being easily distracted, and denied engaging in compulsive behaviors.[24]  His notes also refer to Plaintiff reporting a history of lying, a history which Plaintiff supported by such statements as he had not worked for seven years.

The ALJ also considered the gaps in Plaintiff's pursuit of treatment as detracting from his credibility.  Plaintiff argues this is error because he could not afford treatment.  A lack of sufficient financial resources to pursue treatment for a disabling impairment may be "justifiable cause" for such noncompliance.  **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004).  Although Plaintiff told Ms. Salsman in December 2008 that he could not afford to go to Dr. Patel, he had already not seen Dr. Patel for eight months, he saw Dr. Patel again in January 2009 without any apparent increase in funds, began regularly seeing Dr. Rohatgi in February 2009 without any apparent increase in funds, and then missed four appointments with Dr. Rohatgi's successor, Dr. Vasireddy, without explanation.  There is no evidence that Dr. Patel or any other provider denied Plaintiff treatment or medication because of a lack of funds, and there is also no evidence that Plaintiff attempted to obtain low cost treatment or medication and was rebuffed.  Before a lack of funds may excuse a failure to pursue treatment or obtain medication, there must be evidence that the claimant was denied medical treatment due to financial reasons.  **Goff**, 421 F.3d at 793.  See also **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence

---

[24]The Court notes that Plaintiff listed an obsessive compulsive disorder as a disabling impairment when applying for SSI.

that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay). Such evidence is lacking in the instant case.

Moreover, Plaintiff testified people loaned him money to purchase beer and cigarettes and there is nothing in the record to suggest that they would not advance him money to purchase medication or seek treatment. In **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999), the Eighth Circuit Court of Appeals rejected lack of funds as an excuse for the absence of medical treatment or prescription medicine, finding that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication."

Also, the ALJ considered Plaintiff's poor work history as detracting from his credibility. This is a proper consideration. See **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011); accord **Wildman**, 596 F.3d at 968-69; **Pearsall**, 274 F.3d at 1218.

Additionally, an "'ALJ may discredit a claimant based on inconsistencies in the evidence.'" **Partee**, 638 F.3d at 865 (quoting Goff, 421 F.3d at 792). The record is replete with inconsistencies, including whether Plaintiff's mother was deceased, whether his parents were divorced, whether he had been married twice or once, and if and when he stopped working. Also, his daily activities, a relevant consideration in the credibility analysis, see **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011), included doing laundry, cooking, cleaning, playing video games, and caring for his disabled cousin and, presumably, the disabled cousin's young child. See **Wagner**, 499 F.3d at 851 (taking care of eleven-year-old child,

doing some driving, fixing simple meals, shopping for groceries, and doing housework were '"extensive daily activities'").

Plaintiff further contends that the ALJ erred by not offering a sufficient explanation for his credibility determination. As discussed above, the ALJ analyzed relevant considerations when evaluating Plaintiff's credibility. The Eighth Circuit held in **Renstrom**, 680 F.3d at 1067 (quoting Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)), that "'[t]he ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints.'" Accord **Jones**, 619 F.3d at 975. Before beginning his explanation of his credibility determination, the ALJ noted that he had considered the factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (Soc. Sec. Admin. July 2, 1996), considerations which mirror the Polaski factors.

Also in of his argument that the ALJ erred in assessing his RFC and credibility, Plaintiff cites his GAF of 21 when he was admitted to Hannibal Regional Hospital, his GAF of 35 on admission to Christian Hospital, and his GAF of 40 on admission to St. Anthony's.[25] Each of these GAFs, including the one that was assessed after the ALJ's decision, see page 21, was assessed when Plaintiff was admitted to a hospital following a period during which he was not taking his medication. His GAFs assessed by Dr. Rohatgi when he was being consistently treated were 55. The limitations reflected in this rating, see note 8, supra, are consistent with the ALJ's RFC findings. In **Jones**, 619 F.3d at 973, the Eighth Circuit rejected the claimant's

---

[25]As noted by the Commissioner, the ALJ could not have considered records from St. Anthony's about a hospitalization that occurred after he rendered his decision.

argument that GAF scores in low 50s established disability based on mental impairments. The court also cited the holding from a Sixth Circuit case noting that the Commissioner has declined to endorse GAF scores for use in disability programs and that the court has affirmed the denial of disability benefits to claimants with GAF scores of 50 or lower. **Id.** at 973-74 (citing DeBoard v. Comm'r of Soc. Sec., 211 Fed. Appx. 411, 415 (6th Cir. 2006) (unpublished).

As noted above, Plaintiff has the burden at step four of establishing his RFC. See **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). On the other hand, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." S.S.R. 96-8p, 1996 WL 374184, * 7 (Soc. Sec. Admin. July 2, 1996). The concern of Ruling 96-8p is "that a failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting Ruling 96-8p). The ALJ did not, however, overlook any of Plaintiff's limitations supported by the record. Thus, Plaintiff's argument that the ALJ did not comply with S.S.R. 96-8p is without merit.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] will not reverse the decision

merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  5th  day of July, 2012.